UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| SHARON HUBBARD, | : | |
| --- | --- | --- |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | 3:05-cv-1514 (VLB) |
| TOTAL COMMUNICATIONS, INC., | : | |
| Defendant. | : | September 17, 2008 |

**MEMORANDUM OF DECISION AND ORDER DENYING THE DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW OR IN THE ALTERNATIVE FOR A NEW TRIAL [Doc. #107]**

This case was tried before a jury from November 26, 2007, through December 3, 2007. The jury returned a verdict for the plaintiff, Sharon Hubbard, on her claims that the defendant, Total Communications, Inc. ("Total"), her former employer, retaliated against her for having opposed gender discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e) ("Title VII") and the Connecticut Fair Employment Practices Act, Connecticut General Statutes § 46a-58 et seq. ("CFEPA"). Now before the court is Total's renewed motion for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(b) or in the alternative for a new trial pursuant to Rule 59. [Doc. #107] For the reasons hereinafter set forth, the motion is DENIED.

I. Facts

The jury could have reasonably found the following facts from the evidence introduced at trial. Total is a telecommunications company that sells, installs,

1

and maintains telephone systems.  Hubbard worked as a dispatcher for Total from 1984 until her termination on March 10, 2004.  Her duties required her to work on a computer almost exclusively.  During the relevant time period, she reported to Joseph Binimelis, Total's service manager.  Binimelis reported directly to Joseph Gay, Vice President of Operations. The service department under Binimelis consisted of ten to fifteen service technicians and two dispatchers.  During the relevant time period, all of the technicians were men and all of the dispatchers were women.

Total has a policy that each employee receive an annual performance review from his or her supervisor.  Employees cannot receive a promotion or raise, including his or her standard, annual pay increase, until a performance review is conducted.  If a performance review is not conducted in a timely manner, the employee's pay raise is made retroactive to the date the review should have been conducted.

Hubbard was due a performance review in January 2003.  She requested her review from Binimelis several times.  Binimelis spoke with Gay about Hubbard's delayed 2003 review several times.  At a certain point in 2003, Gay told Binimelis that Gay had to discuss Hubbard's review with Richard Lennnon, Total's President, before the review could be conducted.  The witnesses could not recall the timing of Gay and Lennon's discussion.

On October 27, 2003, Hubbard sent the following e-mail to Binimelis:

REVIEW/RAISE/RETRO

> IT IS REALLY NICE TO FIND OUT THAT THE ENTIRE SERVICE DEPT GOT THEIR REVIEW/RAISES THAT WERE DUE IN JULY 2003. WHICH WOULD BE 10-12 GUYS/TECHNICIANS.
>
> KIND OF FUNNY THAT NO ONE CAN SEEN TO GET MY ONE REVIEW/RAISE DONE THAT IS FROM JANUARY 2003. THIS WILL BE THE 3RD YEAR IN A ROW I HAVE BEEN JERKED AROUND FOR OVER 9 MONTHS OR LONGER AFTER REVIEW TIME. I WOULD HAVE THOUGHT THAT 19 YEARS OF SERVICE WOULD HAVE MEANT SOMETHING. IT IS REALLY GETTING OLD BEING TREATED DIFFERENTLY THAN EVERYONE ELSE IN THIS COMPANY. I HAVE A HOUSE AND MORTGAGE TO SUPPORT JUST LIKE EVERY ONE ELSE AND DON'T APPRECIATE THIS.
>
> I WOULD HOPE THAT YOU CAN TAKE CARE OF THIS BEFORE NEXT PAY DAY.

**Ex. 500. Hubbard testified that the e-mail referred to the disparate treatment she received as compared to the men in her department. Binimelis testified that he shared and discussed Hubbard's e-mail with Gay. Gay testified that he did not recall seeing the e-mail or discussing the issue with Binimelis at the time. Binimelis testified that the male technicians in his division were treated differently than female employees at Total. He testified that male technicians always received performance reviews and raises in a timely manner. Nathan Miller, a former Total network technician, testified that Total was like "an old boys' club." When asked if he ever spoke out about the apparently discriminatory treatment, Miller said he did not for fear of being "walked out the door." Total's explanation at trial for the delay in Hubbard's 2003 review was that there was insufficient funds to give Hubbard the pay increase that would accompany her performance review.**

On March 2, 2004, Lennon asked his information technology department to run reports on employee internet use. At the time, Total had no formal policy regarding internet use. On March 8, 2004, Gay sent a company wide e-mail stating that Total monitors internet use and a formal policy on internet use would be issued shortly. It is undisputed that Hubbard had no internet access on March 8, 2004. On the same day, Lennon reviewed the internet use reports. He testified that he was so incensed at the extent of Hubbard's internet usage that he decided to terminate her on his own, without discussing the matter with anyone and without considering a lesser form of reprimand. The internet use reports list the name of websites visited, including pop-ups, and the total amount of information processed from that website. It does not indicate the nature of the websites nor the time spent on the websites.

On May 9, 2004, Lennon instructed Gay to terminate Hubbard. Gay convinced Lennon to wait "a day or two" so as not to disrupt workflow. The same day, Lennon sent a company wide e-mail stating that personal internet use was not permitted except during lunch or breaks. On March 10, 2004, Total terminated Hubbard's employment for "willful misconduct" for excessive personal internet use. At Hubbard's unemployment hearing, David Bucci, Vice President of Total, represented that both Gay and Lennon determined Hubbard's internet use was excessive. Hubbard filed a complaint with the Connecticut Commission Human Rights and Opportunities ("CHRO"). Total represented to the CHRO that both Gay and Lennon were responsible for the decision to

4

terminate Hubbard. Ex. 12. Lennon testified that Gay is one of the individuals who "run the company." (Tr. Trans. at p. 358)

## II. Standard

"Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in her favor. In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury." Galdieri-Ambrosini v. National Realty & Dev. Corp., 136 F.3d 276, (2d Cir. 1998) (internal citations omitted). "Judgment as a matter of law should be granted when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded persons could not arrive at a verdict against it." Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148, 1154 (2d Cir. 1994)

Rule 59 provides: "The court may, on motion, grant a new trial on all or some of the issues--and to any party--as follows: (A) after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59. "A motion for a new trial ordinarily should not be granted unless the trial court is convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice." Atkins v. New York City, 143 F.3d 100, 102 (2d Cir. 1998).

III.  Discussion

Title VII retaliation claims are evaluated using the three part burden shifting analyses articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 (1973).[1]  "In a nutshell, a plaintiff first bears the minimal burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory reason for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination."  McPherson v. New York City Dept. of Education, 457 F.3d 211, 215 (2d Cir. 2006).

A.  Prima Facie Case

"In order to present a prima facie case of retaliation under Title VII . . . a plaintiff must adduce evidence sufficient to permit a rational trier of fact to find (1) that he engaged in protected participation or opposition under Title VII . . . (2) that the employer was aware of this activity, (3) that the employer took adverse action against the plaintiff, and (4) that a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse employment action."  Kessler v. Westchester County Dept. of Social Services, 461 F.3d 199, 205–06 (2d Cir. 2006).  Total challenges all four

---

[1] Connecticut courts look to federal case law interpreting Title VII for guidance in enforcing CFEPA.  Brittell v. Dept. of Corrections, 247 Conn. 148, 164 (Conn. 1998).  The court's analyses of and findings on Hubbard's Title VII claim applies equally to her CFEPA claim.

elements of Hubbard's prima facie case.

### 1. Protected Activity

Total's argument that Hubbard did not participate in protected activity is unconvincing. She complained to her direct supervisor that she had been subjected to gender discrimination when she stated that the "guys" had gotten a review, but she had not. She was tired of being treated "differently than every one else." Binimelis, the e-mail recipient, was directly responsible for ensuring that both the "guys" and Hubbard received their reviews. He testified that the "guys" always received timely reviews. This is a clear cut case of an employee engaging in the protected activity of voicing her opposition to activities she reasonably perceived to be discriminatory. Cruz v. Coach Stores, Inc., 202 F.3d 560, 566 (2d. Cir. 2000).

### 2. Total's Awareness

Total argues that because Lennon testified that he had not seen Hubbard's October 27, 2003, e-mail, and that he made the decision to terminate Hubbard without consultation, the person responsible for the termination decision was not aware of any protected activity. This argument ignores the facts on the record.

Binimelis was unquestionably aware of the protected activity. He testified that he showed the e-mail to Gay and discussed it. Gay did not recall. Total admits that Binimelis and Gay discussed Hubbard's delayed review several times. It is entirely within reason for the jury to conclude that Gay saw the e-mail and discussed its contents with Binimelis. Total represented at Hubbard's

employment hearing and before the CHRO that both Gay and Lennon were involved in Hubbard's termination.  In further support, Gay admitted to discussing Hubbard's delayed review with Lennon in 2003.  It is a reasonable assumption that they would revisit the topic at some point prior to March 10, 2004, especially when discussing Hubbard's internet usage report on March 9, 2004.  The jury could have found that Lennon also knew about the e-mail.  It is therefore reasonable that the jury concluded a person directly involved in Hubbard's termination had knowledge of her protected activity.

### 3.  Adverse Employment Action

Total does not contest that Hubbard's termination constituted an adverse employment action.  It does argue that the termination is the only adverse employment action Hubbard suffered.

An adverse employment action is "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Burlington Northern & Santa Fe Ry. v. White, 548 U.S. 53, 57 (2006).  "[A]dverse employment actions include discharge, refusal to hire, refusal to promote, demotion, reduction in pay, and reprimand."  Hoyt v. Andreucci, 433 F.3d 320, 328 (2d Cir. 2006).

Total's failure to provide Hubbard with a performance review clearly fits within the definition of an adverse employment action.  Hubbard could not receive a raise or promotion without her review, including her standard yearly wage increase.  Total was denying her a percentage of her salary.  This is

8

supported by Total's stated reason for avoiding Hubbard's review: they did not want to pay her more.  Total completely ignores these facts in their argument.

4.  Causal Connection

"[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

Total's argument that Hubbard presented no evidence of a causal link between her e-mail and the adverse employment actions she suffered is premised on their argument that her termination was the only adverse employment action that she suffered.  Hubbard was terminated in March, four and one-half months after her e-mail, too remote a time frame for the temporal link to qualify as circumstantial evidence of a causal link.  This argument again ignores several key pieces of evidence.

First, Total refuses to acknowledge the trial testimony regarding the atmosphere for its workers.  Miller testified that it was "an old boys' club."  He also testified that he feared he would be "walked out the door" if he spoke up about the atmosphere at Total. Binimelis testified that men and women were treated differently.  Specifically, he testified that men always got their reviews on time.  This is not the picture of a working environment welcoming to women or

9

employee complaints. This is further supported by Lennon's harsh, curt, and unwelcoming demeanor on the witness stand.

Second, the failure to provide Hubbard with a performance review and accompanying increased income and retroactive compensation was an adverse employment action that occurred, at least in part, immediately following Hubbard's e-mail. The e-mail references that the "guys'" reviews were due in July 2004 and completed by October 27, 2003. It would appear that the logical time to conduct Hubbard's review, if it were to ever occur, would be on the heels of the rest of the department's reviews, especially when the issue was brought to management's attention through her e-mail. That the discrepancy in treatment Hubbard received was not remedied immediately following Binimelis and Gay's discussion of the e-mail is circumstantial evidence of a causal link between her complaint and her adverse employment action. See Clark County School Dist. v. Breeden, 532 U.S. 268, 273 (2001) (temporal proximity of protected activity and adverse employment action must be "very close"). While the temporal link between the e-mail and Hubbard's termination is not as close, coupled with the circumstantial evidence of Total's disparaging work environment it also satisfies the fourth element of Hubbard's prima facie case. See Id. (temporal proximity requirement relaxed when other circumstantial evidence present).

### B. Legitimate Business Reason

Hubbard does not contest that Total asserted a legitimate business reason for terminating Hubbard and not providing her with a review and raise. Total

10

provided evidence that Lennon believed excessive internet use at work slows productivity, and after seeing Hubbard's internet use report he determined that she could not be productive and should be terminated. It also provided evidence that after discussions between Binimelis and Gay, and Gay and Lennon, management decided there was not enough money to give Hubbard a pay increase and her review should not be given.

## C. Pretext

In light of Total's stated business reasons for not reviewing and terminating Hubbard, she "must point to evidence that would be sufficient to permit a rational factfinder to conclude that the employer's explanation is merely a pretext for impermissible retaliation." Treglia v. Town of Manlius, 313 F.3d 713 (2d Cir. N.Y. 2002)

The jury reasonably could have, and did, find that Total's stated reason for terminating Hubbard was false. First, there are the inconsistent statements about who made the decision to terminate Hubbard. Total certified to two state administrative agencies, at her unemployment hearing and in defense of her CHRO complaint, that both Gay and Lennon participated in the termination decision. Gay was intimately involved in the decision not to review Hubbard, and there is testimony that he saw her October 27, 2003, e-mail and discussed the issue with her supervisor. Total admitted that Gay and Lennon met on March 9, 2004, to discuss Hubbard's termination and Gay persuaded Lennon to wait to terminate her. At trial, however, Total insisted that Lennon made the decision to

terminate her without consultation.  Total's complete change of position as to who made the decision to terminate Hubbard could reasonably lead a jury to find its explanation false, especially in light of its admission that Gay and Lennon did in fact discuss the termination.

      Second, Total e-mailed all employees on March 8, 2003, that an internet policy would be in effect shortly.  Lennon followed this with a stern e-mail the next day.  Hubbard was fired for excessive internet use the day after that.  However, Total admits that she did not have access to the internet at the time.  The timing of Total's sudden attention to internet use and Hubbard's termination could be viewed suspiciously by the jury, especially as Hubbard did not have internet access at the time.  The jury is left with the impression that, if believed, Total either terminated Hubbard for violating a policy that was not in effect (pre-March 8) or the e-mails were created to justify her termination.

      Third, Lennon's testimony presents the jury with several facts that support a finding that Total's stated reason is pretext.  The internet reports gave no indication of what type of websites were visited, why the employee visited those websites, how long an employee was on each website, whether the listed websites were intentionally visited, or whether the listed websites were active on the page.  For example, the report provided the web address for each website but not its content, and Lennon never checked its content.  For websites with readily identifiable content, such as http://www.courant.com/ for the *Hartford Courant*, Lennon never investigated whether Hubbard visited the websites for business

purposes such as traffic and weather conditions to relay to her field technicians. A website was included on the list even if it was a pop-up or if Hubbard visited the website for a matter of seconds. Total offered testimony that Lennon was capable of differentiating the time usage on certain websites because the report listed the amount of information processed from each website. Lennon did not try to investigate which websites require that more information be processed based on their content, such as photos and advertisements as opposed to simple text. The best example of the reports' faults is that of streaming music over the internet. If Hubbard wanted to listen to music over the internet, she could have opened a website with an unfamiliar web address, begin playing music, minimize the window on her screen and return to work while listening. This would not have impeded her work in any way—there was no prohibition on music during work hours at Total—but would require that an enormous amount of information be processed.

Lennon's stated reason for terminating Hubbard centers on his statement that he was so incensed by her internet use report that he reactively made the decision to terminate her. Yet, when he communicated this to Gay, Gay was able to convince Lennon to wait to terminate her so as not to disrupt the workflow. This presents the jury with two unfavorable questions: if Lennon was so swayed by the report that he made a knee-jerk reaction, how could he be so easily convinced to wait "a day or two?"; and if Hubbard was being fired because Lennon was convinced she was surfing the internet and not working, why would

it disrupt the workflow to terminate her?

Finally, there is the unreasonableness of Lennon's position on internet use. He testified that he would terminate anyone using the internet for personal reasons during work hours. Yet, when presented with his own internet use report, there were a litany of real estate websites and those catering to yacht owners.[2] Total is also faced with the implausibility of Lennon's position. It is simply not believable in the internet age that an employee required to work almost exclusively at a computer, employed by a telecommunications company, would be expected to never access the internet for a non-work related matter during working hours. While companies may strive for efficiency out of their employees, they would cease to function if employees were summarily fired for using the internet. Internet use has become elemental. Would Lennon have summarily terminated Hubbard for receiving personal telephone calls at work? Reasonably, no.

All of the above, combined with the circumstantial evidence of a work environment unfriendly to women or employee complaints was sufficient for the jury to reasonably find Total's stated reason for terminating Hubbard was pretext.

The parties do not brief whether there is evidence of pretext regarding Total's failure to review Hubbard. As discussed above, there was testimony that

---

[2]Based on the employee identification information on this report, it cannot be determined whether this report was for Lennon or his son's internet use. However, after extensive testimony about the contents of the report, including the type of yacht Lennon owns, the report was almost certainly Lennon's.

14

these reviews were given differently to men and women, the adverse employment action was temporally proximate to her e-mail, and those who saw the e-mail were directly responsible fore conducting Hubbard's review. The jury could have concluded that money was not the issue. If Total simply would not pay Hubbard more, it would have been easier to simply tell her instead of dealing with her inquiries and conducting repetitive meetings among Binimelis and Gay.

## IV. Conclusion

Based on the above reasoning, Total's motion for judgment as a matter of law or in the alternative a new trial is DENIED. Its motion does not adequately address all the testimony produced at trial, merely presenting the testimony in its favor. The jury could have, and did, find that Total retaliated against Hubbard for opposing discriminatory practices in violation of Title VII and CFEPA. The judgment entered in the plaintiff's favor stands.

                              IT IS SO ORDERED.

                              /s/

                              Vanessa L. Bryant

                              United States District Judge

Dated at Hartford, Connecticut: September 17, 2008.